FILED

NOV 09 2017 PX

THOMAS G. BRUTON
CLERK. U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THEODIS CHAPMAN,
PATRICK NELSON,
and  A CLASS OF UNKNOWN PERSONS
SIMILARLY SITUATED,
            Plaintiffs,

1:17-cv-08125
Judge Virginia M. Kendall
Magistrate Judge Susan E. Cox

        vs.

AFSCME COUNCIL 31, Local 3477
And UNKNOWN PERSONS,

            Defendants.

)  JURY DEMANDED
)
)
)

## COMPLAINT

Plaintiffs, Theodis Chapman, Patrick Nelson, and a class of unknown persons similarly situated present and past African-American Cook County Juvenile Probation Officers, employed by the Hon. Timothy Evans, Chief Judge of the Circuit Court of Cook County, Illinois ("Chief Judge"), have instituted this action, based on reasonable cause that defendants AFSCME Council 31, in collusion with the Chief Judge (Jordan vs. Evans), Cook County's Juvenile Probation And Court Services Department, Michael Rohan, Charles Young, Rose Marie Golden, William Patterson Keith Sevik, Thomas Edstorm, Avik Das, Scott Miller, Maggie Lawrence, Nefertiti Smith, and unknown persons, acting in their official and individual capacities, have jointly agreed and individually engaged in a pattern and practice of race discrimination which has exhibited itself in the following areas reflecting disparate treatment:

A. A greater amount of discipline than received by non-African-American probation officers for the same character and degree of misconduct; of which AFSCME Council 31, the exclusive union representatives of the members of Local 3477 failed to protect those African-American probation officers that were directly targeted and affected thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

*As stated in the (Preamble) of the Collective Bargaining Agreement entered into between the Chief Judge of cook County as the Employer of employees covered by the CBA and the American Federation of State, county, and Municipal Employees (AFSCME) for and on behalf of Local 3477 (herein referred to as the "union").*

*As stated in Article 1 (Recognition), Section 1. Representative Unit: The employer recognizes the Union as the sole and exclusive representative for all employees of the employer in the job classification set forth in Appendix A of this agreement and excluding all confidential employees, supervisors and managers.*

The deliberate use in official records of different terminology to describe the same character of misconduct allegedly committed by African- American probation officers from those allegedly committed by non-African-American probation officers; of which AFSCME Council 31, the sole and exclusive representatives of the members of Juvenile Probation Union Local 3477 failed to protect those African-American probation officers that were directly targeted and affected thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

The number of written and verbal reprimands, and suspensions, received by African-American probation officers compared to non-African American probation officers; of which AFSCME Council 31, the sole and exclusive union representatives of the members of Local 3477 failed to protect those African-American probation officers that were directly targeted and affected thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

The arbitrary use of a "Last Chance Agreement" system to discipline and terminate the employment of African-American probation officers, in violation of their union employment contract; of which AFSCME Council 31, the sole and exclusive union representatives of the members of Local 3477 failed to protect those African-American probation officers that were directly targeted and affected thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

AFSCME Council 31's actions to purposely frustrate and deprive the plaintiffs and the local union representatives representing African American Juvenile Probation Officers, from lawfully gaining access to historical and current records which would support not only the claims of racially-based disparate treatment, but also the existence of defendants' pattern and practice of carrying out this racially-based disparate treatment, delaying grievance/due process for African American Juvenile

Probation Officers seeking fairness through a neutral and non-biased arbitrator; of which AFSCME Council 31, the sole and exclusive union representatives of the members of Local 3477 failed to protect those African-American probation officers that were directly targeted and affected thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

Actions by defendants, who were put on notice by the *(Juvenile Probation Union Local 3477 which is represented by AFSCME Council 31)* complaining of their disparate racial discrimination, to disguise the racially- based disparate treatment by scapegoating white probation officers through claims of misconduct and discipline. of which AFSCME Council 31, the sole and exclusive union representatives of the members of Local 3477 failed to protect those African-American probation officers that were directly targeted and affected thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

B. During a union grievance hearing concerning the defendants' claim of misconduct by Edward Walsh, a white juvenile probation officer, Walsh was told by defendant William Patterson that if management did not discipline him, the union would accuse management of being discriminatory. Edward Walsh then told defendant Patterson that he was only being disciplined by management to make a statement.

**JURISDICTION AND VENUE**

4

1. This action is brought pursuant to the Civil Rights Act of 1866, 1870, Title VI of the Civil Rights Act of 1964, Civil Rights Act of 2004, Title VII of the Civil Rights Act of 1964, 42 U.S.C. 1981, 1983, the equal protection and due process clauses of the Fifth and Fourteenth Amendments, U.S. Constitution, and Illinois Constitution. Plaintiffs assert Illinois Constitutional claims for wrongful discharge.

2. Jurisdiction is conferred on plaintiffs' federal claims upon this United States District Court by 28 U.S.C. 1331, 1343, 42 U.S.C. 2000e-5(f), 42 U.S.C. 1981, 1983, 1985. This Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. 1367.

Venue is proper in this District pursuant to 28 U.S.C. 1391 because the events giving rise to this claim occurred in this District.

    4. The plaintiffs have met the administrative prerequisites prior to instituting these legal proceedings. The named plaintiffs filed their charge of race discrimination before the U.S. Equal Employment Opportunity Commission (EEOC). The EEOC issued right to sue letters dated August 8, 2017 to plaintiffs Patrick Nelson, and Theodis Chapman. Plaintiffs Nelson, and Chapman received in the mail the right to sue letters on August 12, 2017.

## THE PARTIES

Plaintiffs Theodis Chapman, and Patrick Nelson are African-American citizens of the United States and residents of Cook County, State of Illinois. At all relevant times Plaintiffs Chapman and Nelson are employed as Cook County Juvenile Probation Officers. At all relevant times witnesses Jordan and Greenlaw witnesses were employed as Cook County Juvenile Probation officers, but were subsequently discharged; of which AFSCME Council 31, the sole and exclusive union representatives of the members of Local 3477 failed to protect those members of color that were directly targeted and affected thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

6

5. Defendant in *Anthony Jordan v. Hon. Timothy Evans*, is Chief Judge of the Circuit Court of Cook County, Illinois. is an "employer" as defined in 42 U.S.C. 12111, 29 C.F.R. 1630.2. Separate from his judicial duties and Illinois Constitutional authority, defendant Chief Judge is administratively responsible for supervising defendant Cook County's Juvenile Probation And Court Services Department, an entity with greater than 15 employees, which is a branch of Cook County, and is governed by the Illinois Probation and Parole Officers Act, 730 ILCS 110, et seq. ("Probation Act"), and the Illinois Juvenile Court Act, 705 ILCS 405/1-1 et seq. ("Juvenile Court Act"). Although the Chief Judge has authority to delegate to the Director of Court Services [1] the employment of probation officers to provide juvenile probation services, maintain services and programs designed to aid juveniles specified in the Probation Act and Juvenile Court Act, and investigate and gather facts concerning allegations of misconduct, the Chief Judge has ultimate authority and responsibility, including the discipline of the probation officers. Section 405/6-3 of the Juvenile Court Act specifies that

"Any county having more than 1,000,000 inhabitants shall maintain a Court Services Department, which shall be under the authority and supervision of the chief judge of the circuit or of some other judge designated by him."

6. *Anthony Jordan v. Hon. Timothy Evans*, Defendant Hon. Timothy Evans, Cook County's Juvenile Probation and Court Services Department receives federal funding which is used to fund employment, programs, and services of the Department. One of the mandates of Title VI is to ensure that federal monies are not used to finance discrimination on the basis of

7

race, color, or national origin.

[1] The title "Director of Court Services" for Cook County Juvenile Probation is the practical equivalent of the title "Chief Probation Officer" used in the Cook County Adult Probation Department, and in other Illinois Counties.

7. At all relevant times *Anthony Jordan v. Hon. Timothy Evans,* Defendant Michael Rohan is the Cook County Director of Juvenile Probation and Court Services Administration, until his retirement in 2015. The Director of Juvenile Probation and Court Services Administration reports to, and advises the Chief Judge concerning the activities of the Cook County Juvenile Probation Officers, allegations of misconduct, the implementation of programs, budgetary issues concerning federal and county funding. Of which AFSCME Council 31, the sole and exclusive union representatives of the members of Local 3477 failed to protect those members of color that were directly targeted and affected by Michael Rohan former Cook County Director of Juvenile Probation and Court Services Administration, until his retirement in 2015, thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

8. At all relevant times *Anthony Jordan v. Hon. Timothy Evans,* Defendant Charles Young is the Deputy Director of Juvenile Probation and Court Services Administration until his retirement in 2015. Among other duties, Defendant Young works with defendants Chief Judge, Rohan and Golden to investigate, evaluate, and discipline probation officers. At all relevant times Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 failed to protect those affected by Charles Young the former Deputy Director of Juvenile Probation

and Court Services Administration until his retirement in 2015, thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

9. At all relevant times *Anthony Jordan v. Hon. Timothy Evans,* Defendant Rose Marie Golden is the Director of Human Resources of Juvenile Probation and Court Services Administration until her retirement in 2015. Defendant Golden's duties include working with defendants Chief Judge, Rohan, Young, and Patterson in the investigation, evaluation, and discipline of probation officers. Defendant William Patterson was appointed by defendant Chief Judge as successor Director of Human Resources upon the retirement of defendant Golden, and he is currently employed in that position. At all relevant times Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 failed to protect those affected by Rose Marie Golden was the Director of Human Resources of Juvenile Probation and Court Services Administration until her retirement in 2015, thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

1 0

Case: 1:17-cv-08125 Document #: 1 Filed: 11/09/17 Page 11 of 46 PageID #:11

10. At all relevant times *Anthony Jordan v. Hon. Timothy Evans,* Defendant William Patterson was a Deputy Chief Probation Officer until his appointment as Director of Human Resources. At all relevant times Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 failed to protect those affected by William Patterson a Deputy Chief Probation Officer and the Director of Human Resources, thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

11. At all relevant times Unknown Persons defendants are yet to be identified employees and agents of defendant Chief Judge who aided and abetted defendants Chief Judge, Rohan, Young, Golden, and Patterson in their individual, or actions to engage in a pattern and practice of race discrimination and harassment. Unknown persons defendants are also those employees and agents of defendant Chief Judge who were designated as successor administrators to the retired defendants Rohan, Young, and Golden and who continue the pattern and practice of race discrimination and harassment identified in this complaint. At all relevant times Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 failed to protect those affected thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

1 |

## FACTS

12.        Effective December 1, 2008, and still in effect, a Collective Bar-
   gaining Agreement ("CBA") was entered into between defendant Chief
   Judge Timothy Evans and the American Federation of State, County, and
   Municipal Employees ("AFSCME") Council 31 ("The Union"). Defendant
   Council 31 the sole and exclusive legal and union representatives of the
   members of Local 3477 failed to protect those affected thus enacted a
   breach of trust, breach of contract, breach of fiduciary responsibility and un-
   der title 7, acted discriminately, with bias and disparate treatment. It is
   significant the CBA was entered into by defendant Chief Judge Timothy
   Evans, and not the "Office of the Chief Judge". The CBA was signed by de-
   fendant Chief Judge Evans himself, with no language stating or implying
   that his signature was on behalf of the "Office of the Chief Judge".
It is significant the CBA was entered into by defendant AFSCME COUNCIL 31
and not the "UNION". The CBA was signed by defendant AFSCME COUNCIL
31, with no language stating or implying that only those white dues paying
members were eligible for protection under the contract.

There exists no "whites only union" as a legal entity described within the Collective Bargaining Agreement, although an examination of historical litigation concerning claims of discrimination by Cook County Adult, and Cook County Juvenile Probation Officers find frequently within the pleading the use of the expression "The Union" as a substitute for defendant AFSCME Council 31.

The use of the term "The Union" was a fictional device formulated to evade the exposure of personal liability for defendant AFSCME Council 31 unlawful administrative decisions as the "The Sole and Exclusive Union Representative" who participates in, and/or conspires with others including the Chief Judge of Cook County, Cook County Juvenile Probation and Court Services and Management(Former Director Michael Rohan, Former Director Rose Golden, and Acting Director Avik Das), to deprive specifically African American and other minority Juvenile Probation Officers of their State and Federal Constitutional right to be free of discrimination on the basis of race, color, sex, age, religion, disability, national origin, ancestry, and sexual orientation.

13.    In a case heard by district Judge Blanche Manning, *Ibarra v. Chief Judge, No. 04 C 8076,* concerning a Title VII claim of discrimination by an adult Cook County probation officer represented in a CBA where defendant Chief Judge is the "employer", the Court, in a memorandum opinion dated March 19, 2007, held that:

"The Chief Judge is the person who ultimately imposes discipline after a recommendation from the chief probation officer."

14.   The CBA representing the juvenile probation officers contained in pertinent part the following terms:

" <u>Article I, Section 2.</u>  Employer Obligation:

The union recognizes that this Agreement does not empower the Employer to do anything that is prohibited from doing by law."

"<u>Article XX, Section 9.</u>  No Discrimination:

No employee shall be discriminated against on the basis of race, color, sex, age, religion, disability, national origin, ancestry......"

"<u>Article III, Section I</u>.  Employer Rights:

The union recognizes that the Employer has the full authority and responsibility for directing its operations and determining policy........."

**The Historical Pattern, Policy, and Practice of  The Defendant Employer In His Delivery of Discipline to The Juvenile Probation Officers.**

15. <u>Argentry Mitchell</u> .

In 2009 Argentry Mitchell, an African-American supervisory juvenile probation officer, made a claim of Title VII race discrimination against the Chief Judge of the Circuit Court of Cook County. Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 was made aware in 2009 of member Argentry Mitchell, an African-American supervisory juvenile probation officer, claim of Title VII race discrimination but failed to protect Mr. Mitchell, thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

After receiving from the EEOC a right to sue letter, *Mitchell v. Rohan, Patterson, Chief Judge, and County of Cook, No. 09 CV 5874, NDIL*. Although Mr. Mitchell performed his job in a manner which exceeded expectations, he received a 10-day suspension without pay through the claims of defendants Rohan and Patterson that Mitchell's attempts to supervise a subordinate probation officer were faulty.

Yet a non-African-American supervisory probation officer who was accused by the defendants of poorly supervising her subordinate probation officers received only a reprimand.

Defendant Chief Judge was aware of Mr. Mitchell's claims, yet took no action to investigate its veracity, abandoned his duty, and knowingly permitted defendants Rohan, Golden, Young, and Patterson to decide the veracity of evidence, the characterization of the alleged misconduct, and the degree of

discipline.

However, because of errors made by Mr. Mitchell's counsel in the timing of service of the defendants, the district court dismissed the complaint in November, 2010, without ever evaluating the merits of the claims of racial discrimination.

16. Paula Williams.

In 2013, Paula Williams, a veteran African-American juvenile probation officer, who was terminated by the Chief Judge filed a timely complaint alleging that race discrimination and retaliation by defendant Rohan, and "Office of the Chief Judge" was the reason, Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 was made aware in 2013 of member Paula Williams, an African-American female juvenile probation officer, claim of Title VII race discrimination and retaliation, but failed to protect Ms. Williams, thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

*Williams v. Office of Chief Judge and Rohan, No. 13 CV 1116, NDIL.* After a long period of litigation and discovery, the district court granted summary judgment for the defendants on all claims in May, 2015. Ms. Williams has filed a notice of appeal before the Seventh Circuit.

In granting summary judgment on her race discrimination claims, the district court held that Ms. Williams, despite her attempts, failed to pre-

sent indirect evidence of a similarly-situated employee outside of her protected class who was treated more favorably, and failed to present direct evidence, by way of statistical evidence, pretextual reasons for an adverse employment action, or suspicious timing, ambiguous statements from which a retaliatory intent might be drawn.

In discovery depositions defendants Golden and Rohan made the decision to discharge Ms. Williams. Bruce Wisniewski, a human resources assistant to defendant Chief Judge, had no specific recollection that he had been contacted regarding the decision to discharge.

17. <u>Michael Willis</u>.

Michael Willis was a former juvenile supervising probation officer who also served as the president of the union's local 3477 representing Cook County Juvenile Probation Officers, until he retired in December, 2014. During his presidency Mr. Willis, an African-American, was involved in the union's representation of probation officers who faced allegations of misconduct and risks of discipline. Although Mr. Willis did not use the disciplinary records to compile empirical data so as to analyze statistically

the persuasiveness of claims by African-American juvenile probation officers that the degree of their discipline and the characterization of their discipline was disparate from the punishment and characterization meted out to non African-American juvenile probation officers, he was of the opinion that discipline for African-American officers was more severe than for non-

17

African American officers whose allegations of misconduct were similarly sit-
uated. Defendant Council 31 the sole and exclusive legal and union repre-
sentatives of the members of Local 3477 was made aware by Mr. Willis, an
African-American, who was involved in the union's representation of proba-
tion officers until his retirement in 2014 who faced allegations of misconduct
and risks of discipline, Defendant Council 31 the sole and exclusive legal and
union representatives of the members of Local 3477 failed to protect, thus en-
acted a breach of trust, breach of contract, breach of fiduciary responsibility
and under title 7, acted discriminately, with bias and disparate treatment.

18.    Jason Smith.

Jason Smith is an African-American juvenile probation officer
who succeeded Michael Willis as president of union local 3477. Mr. Smith
was previously the vice-president of the local during the tenure of Michael
Willis.

During the period of his position as vice president Mr. Smith was
involved in advocating for his members in the grievance and disciplinary
process. Like Michael Willis, Jason Smith came to the conclusion that
African-American officers were receiving disparate treatment.

Defendant Council 31 the sole and exclusive legal and union representa-
tives of the members of Local 3477 was made aware by Mr. Smith, an African-
American, who was involved in the union's representation of probation offic-
ers.

Because Mr. Smith recognized that prior claims of racial discrimina-
tion to the Equal Employment Opportunity Commission (EEOC), Illinois De-
partment of Human Rights (IDHR), the federal courts, and arbitration were
failing frequently due to the lack of evidence demonstrating either direct, or
indirect, circumstantial proof that the defendants *Anthony Jordan v. Hon.
Timothy Evans,* treated the African-American juvenile probation officer dif-
ferently than similarly situated officers outside of the protected class. Mr.
Smith realized that he needed to construct a mosaic of statistical evidence,
arbitrary, ambiguous statements, inferences of retaliatory intent, and pre-
textual reasons which would allow a fact-finder judge or jury to infer that the
defendant decision- makers intentionally discriminated.

### The Collection of Discipline Records.

19. In 2012 Jason Smith made his first request from defendants *An-
thony Jordan v. Hon. Timothy Evans,* Rohan and Golden for juvenile proba-
tion officer discipline records for the preceding five years. On several occa-
sions the defendants Rohan and Golden would refuse to turn over the rec-
ords, citing pre-textual excuses, such as the information was "irrelevant", or
could not be found.

Finally, Mr. Smith filed an unfair labor charge against the Chief Judge,
which resulted in a decision compelling the defendants to turn over the rec-
ords. Defendant Council 31 the sole and exclusive legal and union representa-
tives of the members of Local 3477 was made aware by Mr. Smith, an African-
American, who was involved in the union's representation of probation officers

of the unfair labor charge filed against the Chief Judge but failed to provide any support or assistance in the investigation of the unfair labor charge against the Chief Judge.

20.    In an effort to substantiate the racial disparate treatment of African-American probation officers, Local 3477 began to compile data reflecting categories of terminations, suspensions, and written or verbal reprimands among the population of approximately 400 juvenile probation officers for the years 2008 thru 2013. For each of these years the categorical data focused on four groups: African-American, Caucasian, Latino, and Other.

21. For the year 2008 there were a total of 12 terminations and/ or suspensions.  Of the 12:

                10 were African-American          (83%)
                1    was Caucasian                (8.5%)

| 1 | was Latino | (8.5 %) |
| 0 | was Other | (0%) |

For the year 2008 there was a total of one written or verbal repri-mand. The one was Latino.

22.  For the year 2009 there was a total of 8 terminations/and or suspensions. Of the 8:

| 7 | were African-American | (87 %) |
| 0 | was Caucasian | (0%) |
| 1 | was Latino | (13 %) |
| 0 | was Other | (0%) |
| | 0. | |
| | 1. | |

For the year 2009 there was a total of 5 written and/or verbal reprimands. Of the 5:

| 3 | were African-American | ( 60%) |
| 1 | was  Caucasian | (20%) |
| 1 | was  Latino | (20%) |
| 0 | was  Other | (0%) |

21

23. For the year 2010 there was a total of 17 terminations and/or suspensions. Of the 17:

| | | |
|---|---|---|
| 12 | were African-American | (71 %) |
| 5 | were Caucasian | (29 %) |
| 0 | was Latino | (0%) |
| 0 | was Other | (0%) |
| | 0. | |
| | 1. | |

For the year 2010 there was a total of 16 written and/or verbal reprimands. Of the 16:

| | |
|---|---|
| 2 were African-American | (12%) |
| 10 were Caucasian | (63%) |
| 4 were Latino | (25%) |
| 0 was Other | (0%) |

24. For the year 2011 there was a total of 18 terminations and/or suspensions. Of the 18:

| | |
|---|---|
| 14 were African-American | (78%) |
| 1 was Caucasian | (5%) |
| 3 were Latino | (17%) |
| 0 was Other | (0%) |

     0.

     1.

For the year 2011 there was a total of 2 written and/or verbal reprimands. Of the 2:

| | |
|---|---|
| 2 were African-American | (100%) |
| 0 was Caucasian | (0%) |
| 0 was Latino | (0%) |
| 0 was Other | (0%) |

25. For the year 2012 there was a total of 6 terminations and/or suspensions. Of the 6:

| | |
|---|---|
| 5 were African-American | (83%) |

| | |
|---|---|
| 1  was Caucasian | (17%) |
| 0 was  Latino | (0%) |
| 0  was Other | (0%) |

     0.

     1.

For the year 2012 there was a total of 2 written and/or verbal reprimands. Of the 2:

| | |
|---|---|
| 2 were African-American | (100 %) |
| 0  was Caucasian | (0%) |
| 0  was  Latino | (0%) |

0 was Other                              (0%)

26.  For the year 2013 there was a total of 10 terminations

and/or suspensions. Of the 10:

     5 were African-American          (50%)
     3 were Caucasian                 (30%)
     2 were Latino                    (20%)
     0 was Other                      (0%)

For the year 2013 there was a total of 2 written and/or verbal repri-

mands. Of the 2:

     0 was African-American           (0%)
     2 were Caucasian                 (100%)
     0 was Latino                     (0%)
     0 was Other                      (0%)

27.  The total number of suspensions and/or terminations for the

years 2008 through 2013  was  71:

53  were  African-American          (75%)

11  were  Caucasian                 (15%)

7  were  Latino                     (10%)

0  was  Other                       (0%)
      0.
      1.

The total number of written and/or verbal reprimands for the years

2008 through 2013 was 28:

9  were African-American            (32%)

13 were Caucasian                   (47%)

6  were  Latino                     (21%)

0  was  Other                       (0%)

28. Union Local 3477 also performed an analysis of the labeling utilized by the defendants to describe the misconduct allegedly committed by juvenile probation officers during the period 2008 through 2013. The analysis revealed that the defendants would use in their records a descriptive label to describe a character of misconduct for a non-African-American probation officer that was less aggravating, but would use a different, more aggravating label for an African-American probation officer who was accused of committing a similar type of misconduct. In this respect, the plaintiffs' analysis is not to make claims of innocence from the allegations of misconduct, but to draw attention to the facts that the defendants gave disparate discipline to African-American probation officers, in contrast to the discipline meted out to non African-American probation officers who engaged in similar, or even more egregious misconduct.

29. Instead of the defendants taking corrective action to cure the disparate treatment complained of by Local 3477, the defendants conspired to make bad faith claims of misconduct against non-African-American probation officers so as to portray the disciplinary acts of the defendants as even- handed for all probation officers. Recently, during a grievance hearing held on behalf of probation officer Edward Walsh, a Caucasian, defendant William Patterson stated that if management did not discipline him the

26

union would say that management was being discriminatory. Edward
Walsh stated to defendant Patterson that he was being disciplined to make
a statement.

Caucasian probation officers were not terminated for egregious con-
duct, which African-American officers would have been subjected to. Four
white female probation officers, three of which are presently employed, were
cited for being romantically and sexually involved with clients, yet none were
terminated or prosecuted.

In another case, a Caucasian probation officer was using county funds
to purchase purses, but she was not terminated.

30.         With the aid of the records, in 2014 Jason Smith sent a letter to
the Civil Rights Division, Employment Litigation Section, Department of
Justice, requesting the initiation of an investigation into racial discrimina-
tion within the Cook County Juvenile Probation Department. A copy of the
letter was sent to defendant Chief Judge.

31.   The union notified defendant Chief Judge personally of several
examples of the disparate treatment of African-American juvenile proba-
tion officers:

a. Emily Pierce.

Emily Pierce is an African American juvenile probation officer who, in an audit concerning performance, was admonished, and was cited by defendant Rohan as deserving of discipline. However, two white probation officers, Dennis Brady and Katie McGoldrick received more negative performance review in the audit, but were never recommended for discipline by defendant Rohan. Defendant Chief Judge took no action to investigate this claim. Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 failed to protect Emily Pierce an African-American juvenile probation officer thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

b. Christen Loeb.

Christen Loeb is a white juvenile probation officer who admitted that she made mistakes which led to another probation officer not being able to complete a social investigation, which lead to a minor remaining in custody. Although such errors would have led to a notice of discipline and investigation by defendant Rohan, Deputy Chief Probation Officer Virginia Caulfield stated that she would never discipline Ms. Loeb. No investigation or discipline ever occurred, although the same conduct by an African American probation officer would have resulted in discipline.

Defendant Chief Judge took no action to investigate this claim.

c. Lauren Brown.

Lauren Brown is an African American juvenile probation officer who was

assigned as a screener and adjudicator within a courtroom. In 2013 she re-
ceived a three-month suspension for not placing notes into a computer sys-
tem. A white probation officer would not have received the same discipline.
Defendant Chief Judge took no action to investigate this claim. Defendant
Council 31 the sole and exclusive legal and union epresentatives of the
members of Local 3477 failed to protect Lauren Brown from bias and dis-
parate treatment as an African-American juvenile probation officer thus
enacted a breach of trust, breach of contract, breach of fiduciary responsi-
bility and under title 7, acted discriminately, with bias and disparate treat-
ment.

### d. Kevin Gavin.

Kevin Gavin is a white juvenile probation officer assigned
as a field probation officer. On two occasions Mr. Gavin received a written
reprimand and a 1.5 day suspension on the accusation that "there are dis-
crepancies" between his time sheets and case logs that cannot be reconciled.

If an African American probation officer committed the same conduct
the accusation would be that they "falsified" their time sheets and case logs.
Defendant Chief Judge took no action to investigate this claim.

### e. Kalthea Seay.

Kalthea Seay is an African American juvenile probation
officer who placed a bid to transfer to another position. Although initially
offered the position defendants Chief Judge and Rohan refused the transfer

because of a claim she did not meet performance standards. In 2014 defendant Rohan transferred Susan Patla, a white probation officer, to that position, even though she was recently disciplined for testing positive for marijuana. The CBA does not permit a probation officer to transfer if they have been disciplined or do not meet performance expectations.

The Chief Judge took no action to investigate this claim. Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 failed to protect Kalthea Seay an African-American juvenile probation officer thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

32.   The discipline records for the years 2008-2013 reveal:

a. The defendants use of different language to classify the same degree and character of misconduct for the white officer from the African American officer;

b. The inordinate number of investigations initiated by the defendants when a complaint is made against an African American probation officer, as contrasted to the white officers;

c. The number of "temporary suspensions" initiated by the defendants for the African American probation officer, as contrasted to the white officers for similar conduct;

d. A greater and more severe amount of discipline imposed upon the African-American probation officer than imposed upon the white officer for similar conduct. Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 failed to protect the African-American juvenile probation officers from inherent bias and disparate treatment that resulted in unjust discipline which was harsher than that of their white co-workers in the same situation, thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

### Anthony Jordan

33. Witness, Anthony Jordan was employed as a probation officer from April, 1998 to February 4, 2015, when he was terminated for alleged misconduct, by purportedly failing to properly monitor and respond to electronic monitoring alerts of a particular youth assigned to his Electronic Monitoring (EM) Unit caseload on September 10, 2014. Two days later, Mr. Jordan completed a form to notify the Juvenile Court judge assigned to the youth's case of the alleged violation by reason of the alerts.

Because the defendants repeatedly stressed to all probation officers assigned to the Electronic Monitoring Unit that the priority was to first expend efforts to have the youths released from custody or temporary detention and placed

on EM, and then review the electronic monitoring system daily, and complete paperwork, Mr. Jordan did his best to accomplish all those duties as his down time would permit. In this case the youth had left his home on multiple occasions, in violation of the EM order. Based upon the order of priorities Mr. Jordan believed that he had discretion concerning when to redirect a youth's behavior, and therefor expend time to admonish the youth, rather than immediately fill out the report.

34.    Although Mr. Jordan had no history of discipline for failing to properly monitor and respond to EM alerts, the defendants in 2011, with the concurrence of a union representative who lacked the authority to enter into such a pact because it violated the procedural and substantive terms of the collective bargaining agreement, had entered into a "Last Chance Agreement", based upon a prior claim of poor work performance. The defendants utilized this Last Chance Agreement to support the termination.

Defendant Chief Judge, although aware of defendants Rohan and Golden's investigation and prosecution of this discipline, did not supervise or exercise his authority in making the decision of discipline.

35.    Mr. Jordan appealed his termination before the Illinois Department of Employment Security. On March 23, 2015 a contested hearing with a witness for the defendants, and Mr. Jordan's testimony, was held before an administrative law judge. The judge found that Mr. Jordan persuasively and credibly detailed his job duties and priorities, and that his actions did

31

on EM, and then review the electronic monitoring system daily, and complete paperwork, Mr. Jordan did his best to accomplish all those duties as his down time would permit. In this case the youth had left his home on multiple occasions, in violation of the EM order. Based upon the order of priorities Mr. Jordan believed that he had discretion concerning when to redirect a youth's behavior, and therefor expend time to admonish the youth, rather than immediately fill out the report.

34.    Although Mr. Jordan had no history of discipline for failing to properly monitor and respond to EM alerts, the defendants in 2011, with the concurrence of a union representative who lacked the authority to enter into such a pact because it violated the procedural and substantive terms of the collective bargaining agreement, had entered into a "Last Chance Agreement", based upon a prior claim of poor work performance. The defendants utilized this Last Chance Agreement to support the termination.

Defendant Chief Judge, although aware of defendants Rohan and Golden's investigation and prosecution of this discipline, did not supervise or exercise his authority in making the decision of discipline.

35.    Mr. Jordan appealed his termination before the Illinois Department of Employment Security. On March 23, 2015 a contested hearing with a witness for the defendants, and Mr. Jordan's testimony, was held before an administrative law judge. The judge found that Mr. Jordan persuasively and credibly detailed his job duties and priorities, and that his actions did

not evidence an intentional disregard of the defendants' interests in the delivery of electronic monitoring services. The judge ruled that Mr. Jordan "was discharged for reasons other than misconduct connected with the work", and was qualified to receive unemployment benefits.

36.    Mr. Jordan's alleged misconduct which was used as the predicate for terminating his employment was not an uncommon omission for probation officers assigned to the EM Unit. Yet those probation officers who may be late in making their reports are not terminated. But as the administrative law judge believed, Anthony Jordan was not terminated for this misconduct. He was terminated because he, as an African-American, was made the scapegoat of the defendants who had to blame someone for the fact that this youth committed a crime while on electronic monitoring, and that this crime received a substantial amount of Chicago-area press, TV, and radio coverage. According to the mindset of the defendants, Mr. Jordan had to pay the price.

A greater and more severe amount of discipline imposed upon the African-American probation officer than would have been imposed upon a white officer for similar conduct. Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 failed to protect Anthony Jordan an African-American juvenile probation officers from inherent bias and disparate treatment that resulted in unjust discipline and termination, which was harsher than that of a white co-workers in the same or similar situation, thus enacted a breach of trust, breach of contract, breach of fiduciary

32

responsibility and under title 7, acted discriminately, with bias and disparate treatment.

### Kenneth Greenlaw

37.   Witness Kenneth Greenlaw began his career as a juvenile probation officer in 1999. Although he had no prior disciplinary record, Mr. Greenlaw was terminated on April 22, 2014 on the allegation that he misused the assigned gas card by making gas purchases outside of documented work hours, failure to submit gas receipts on certain days, and vehicle inspection forms. Mr. Greenlaw was assigned to the Intensive Proba-tion Services Unit (IPS), an assignment which required the use of a vehicle and constant travel to maintain frequent contact with youths on probation. Although Mr. Greenlaw defended these charges by denying that he misused the gas card, and that his geographic area covered the south and southwest Cook county regions, as well as travel outside the region for the purpose of meetings, picking up youths at the main Juvenile Court building (1100 S. Hamilton Avenue, Chicago), and admittedly failing to do the paperwork be-cause he believed that it was the least priority, he was terminated by defend-ant Rohan, who stated that Mr. Greenlaw's "integrity had been compromised to the degree that you can no longer be entrusted to perform any duties re-lated to this department."

38.   However, what defendant Rohan failed to state, was that Cook

County auditors were examining the defendants' records of expenditures, and that Mr. Greenlaw became a convenient scapegoat. Kenneth Greenlaw was not the only probation officer who failed to complete his gas card paperwork, but he was the only probation officer terminated.

The Chief Judge, although aware of former Director Michael Rohan's investigation and prosecution of this discipline, neither supervised or exercised his authority in making the decision of discipline. A greater and more severe amount of discipline imposed upon the African-American probation officer than would have been imposed upon a white officer for similar conduct. Defendant Council 31 the sole and exclusive legal and union representatives of the members of Local 3477 failed to protect Kenneth Greenlaw an African-American juvenile probation officers from inherent bias and disparate treatment that resulted in unjust discipline and termination, which was harsher than that of a white co-workers in the same or similar situation, thus enacted a breach of trust, breach of contract, breach of fiduciary responsibility and under title 7, acted discriminately, with bias and disparate treatment.

### Theodis Chapman

39.   Plaintiff Theodis Chapman has a Bachelor's Degree in Social Work, and a Graduate degree Masters of Arts Degree (Political and Justice Studies). Mr. Chapman was appointed a juvenile probation officer in 2003, where he has continued to work to the present, and consistently has received performance appraisals which "Exceed Standards". He has no history

of discipline. Mr. Chapman adds to his work by volunteering to work with disadvantaged youth in the Chicago community, free tutoring and literacy instruction to probationers with literacy deficiencies, mentoring probationers that have no parental support or foundation, providing gang intervention counseling to probationers recruited by gangs at an early age, organizing and planning events with families, such as "back to school rallies". For these efforts Mr. Chapman has received commendations, and merit bonus payments.

40. Nevertheless, attempts by Theodis Chapman to become a supervisor in the juvenile probation department have met with defeat and frustration. In November, 2007 and February, 2012 Mr. Chapman took the supervisors written examination. To pass the exam a minimum score of 70 is required, yet Mr. Chapman was advised that he scored on those dates a 44, and a 57, respectively, despite diligent preparation for the examinations. On both occasions Mr. Chapman has requested copies of his test and the scoring method, but he has been denied.

41. Mr. Chapman claims that a disproportionate number of African-American probation officers, some with advanced graduate degrees, are advised that they fail the supervisory examination, but have not been afforded the opportunity to review the examination results and the scoring methods. Mr. Chapman claims that African-American probation officers are discriminated upon by reason of their race, and that the designing of the supervisory examination is either intentionally, or unintentionally, created to subjectively discriminate against African-Americans.

35

42.    Mr. Chapman claims that he has been intentionally denied compensatory time for which he earned from his working with juvenile delinquents beyond his normal work hours. Unlike his white counterparts who were not denied compensatory time for their work with juvenile delinquents beyond their normal work hours.

43.    Mr. Chapman claims that he has been intentionally forced to use unnecessary compensatory time for which he earned from his working with juvenile delinquents beyond his normal work hours. Unlike his white counterparts who were not forced to use unnecessary compensatory time for the same.

44.    Mr. Chapman claims that he was denied seniority rights and was removed from his previous position and was replaced with two less senior officers.

45.    Mr. Chapman claims he was discriminated against after being removed from his previous position he was never offered a similar position that became available which was assumed by a white officer. Mr. Chapman became aware of the un posted vacancy by the white officer whom informed Mr. Chapman he received a call from DCPO Donna Neal asking if he wanted the position. Mr. Chapman was never afforded a phone call, or written notice that a vacancy in his former unit was available, and if he was interested in returning to his previous unit to assume a newly vacant/created non-posted position.

### Patrick Nelson

46.   Plaintiff Patrick Nelson is a college graduate, and prior Du-Page County Deputy Sheriff who worked as a principal of an alternative school, who was appointed a juvenile probation officer in 2001. Both Mr. Nelson and Mr. Chapman filed grievances with their union claiming that they were denied compensation for time spent doing job-related training out of state, when white probation officers did receive compensation for similar out of state training. The grievances were denied by the defendants.

47.   Mr. Nelson claims that he has been intentionally denied compensatory time for which he earned from his working with juvenile delinquents beyond his normal work hours. Unlike his white counterparts who were not denied compensatory time for their work with juvenile delinquents beyond their normal work hours.

48.   Mr. Nelson claims that he has been intentionally forced to use unnecessary compensatory time for which he earned from his working with juvenile delinquents beyond his normal work hours. Unlike his white counterparts who were not forced to use unnecessary compensatory time for the same.

49.   Mr. Nelson claims that he was denied seniority rights and was removed from his previous position and was replaced with two less senior officers.

50.     Mr. Nelson claims he was discriminated against after being removed from his previous position, he was never offered a similar position that became available in his previous unit which was assumed by a white officer. Mr. Nelson became aware of the assumed un posted vacancy in his previous unit by the white officers name suddenly appearing on the door of his previous unit he was forcibly removed from by management with no explanation. Like Mr. Chapman, Mr. Nelson never received a call from DCPO Donna Neal asking if he wanted to return to his previous unit in the vacant non-posted position. Like Mr. Chapman, Mr. Nelson also was never afforded a phone call, or written notice that a vacancy in his former unit was available, and if he was interested in returning to his previous unit in a newly vacant/created position.

## COUNT ONE
### Civil Rights Act of 1866, 1870, and Fourteenth Amendment

51.     Plaintiffs incorporate and restate each of the above paragraphs 1 through 50 as if fully set forth herein.

52.     The plaintiffs have a contractual relationship with the defendants by reason of their collective bargaining agreement.

53.     The Civil Rights Act of 1866 prohibits not only discrimination in the formation of the contractual relationship, but also in all aspects of the contractual relationship, including the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

54. As a direct and proximate result of defendants' race-based discriminatory conduct and disparate treatment, the plaintiffs have suffered emotional distress, physical distress, loss of employment, and loss of wages.

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against defendants, and award compensatory and punitive damages, costs, lost wages, loss of employment, attorney fees, and any other such relief that the Court may deem appropriate.

## COUNT TWO
### 42 U.S.C., 1981, 1983

55. Plaintiffs incorporate and restate each of the above paragraphs 1 through 50 as if fully set forth herein.

56. Defendants have acted under color of state law when defendants deprived plaintiffs of their federal rights, and otherwise discriminated against plaintiffs because of their race.

57. The disparate treatment and discriminatory conduct of all defendants, both separately and collectively, in their treatment of the plaintiffs, evidenced the existence of an agreement for the purpose of depriving the class of African-American juvenile probation officers from the equal protection of the laws.


58. As a direct and proximate result of defendants' violations of 42 U.S.C. 1981 and 1983, the plaintiffs have suffered emotional distress, physical distress, loss of employment, loss of wages.

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against the defendants, and award compensatory and punitive damages, lost wages, costs, attorney fees, and whatever relief this Court may deem appropriate.

## COUNT THREE
### Title VI of Civil Rights Act of 1964,
### Civil Rights Act of 2004

59.     Plaintiffs incorporate and restate each of the above paragraphs 1 through 41 as if fully set forth herein. Title VI prohibits the use of federal funds not be spent in any fashion which encourages, entrenches, subsidizes or results in racial discrimination.

60.     As a direct and proximate result of defendants' violations of Title IV and the Civil Rights Act of 2004, the plaintiffs have suffered emotional distress, physical distress, loss of employment, loss of wages.

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against the defendants, and award compensatory damages and punitive damages, costs, attorney fees, and whatever further relief this Court may deem appropriate.

## COUNT FOUR
### Title VII of the Civil Rights Act of 1964

62.     Plaintiffs incorporate and restate each paragraph 1 through 56, as if fully set forth herein.

63.     The defendants' disparate treatment of African-American juvenile probation officers evidenced racially discriminatory employment practices.

64.     As a direct and proximate result of defendants' violations of Title VII the defendants have suffered emotional distress, physical distress, loss of employment, loss of wages.

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against the defendants, and award compensatory damages and punitive damages, costs, attorney fees, and whatever further relief this Court may deem appropriate.

### COUNT FIVE
**State Claim- Wrongful Termination**
**Violation Due Process, Equal Protection, and No Discrimination in Employment Sections of Illinois Constitution.**

65.     Plaintiffs Chapman and Nelson incorporate and restate each paragraph 1 through 59  as if fully set forth herein.

66.     The conduct of the defendants by reason of their disparate treatment of African-American juvenile probation officers in the manner of permitting the imposing of bias and disparate treatment including but not limited to the discipline and termination of employment of African American probation officers i.e., Anthony Jordan and Kenneth Greenlaw evidenced racial discrimination in violation of the Due Process, Equal Protection, and No Discrimination in Employment Clauses of the Illinois Constitution, and resulted in emotional distress, physical distress, loss of wages.

WHEREFORE, plaintiffs Theodis Chapman and Patrick Nelson pray that this Court enter judgment in their favor and against the defendants, and award compensatory and punitive damages, costs, attorney fees, and whatever further relief this Court may deem appropriate.

## COUNT SIX
### Section 1983 *Monell* Claim Against Cook County Juvenile Probation and Court Services Department

67.     Plaintiffs incorporate and restate each paragraph 1 through 61 as if fully set forth herein.

68.     The entity, defendant AFSCME Council 31, along with Cook County Juvenile Probation and Court Services Department, was to conduct its business in collusion with the Chief Judge.

69.     The defendant AFSCME Council 31, although having the ultimate responsibility to contest and question any imposed discipline against its members including those African American Probation Officers affected, failed to challenge the discipline, and consciously and continually abrogated that duty to the Chief Judge and his designees: Rohan, Golden, Young, and Patterson, who imposed discipline in a racially discriminatory manner against African American juvenile probation officers.

70.     That the defendant AFSCME Council 31consciously and continually abrogated their duty as sole and exclusive representatives of members of Local 3477 which included African American Probation Officers to contest the imposition of discipline, even though they had been continually advised, warned, and notified by Jason Smith and others that Chief Judge, and his designee's: Rohan, Golden, Young, and Patterson were imposing discipline in a racially discriminatory manner.

71.     That the conduct of defendant AFSCME Council 31, in collusion

with the Chief Judge, and his designees: Rohan, Golden, Young, and Patterson described in paragraphs 64 and 65, as well as paragraphs 1 through 61 of this complaint represented a custom and practice which was long-standing and had the force of law, although not in written form.

72.          As a result of, and because the aforementioned conduct of defendants AFSCME Council 31 in collusion with the Chief Judge and his designees: Rohan, Golden, Young, and Patterson represented an unlawful long-standing custom and practice which caused African American juvenile probation officers to suffer the indignities of racial prejudice, unfair disparate discipline, loss of wages, termination, emotional and physical distress, *the American Federation of State, County and Municipal Employees* and the County of Cook and its Juvenile Probation and Court Services Department *Jordan v. Office of Chief Judge* are liable to the plaintiffs for their damages.

WHEREFORE plaintiffs pray that this Court will enter judgment in their favor against *American Federation of State, County and Municipal Employees Council 31 and Local 3477*, if available award plaintiffs compensatory and punitive damages of $225,000 liquidated/ double damage, front pay, prejudgment interest, post judgement interest, lost wages, and costs, including reasonable attorney' fees, expert witnesses and grant whatever such other relief the Court may find appropriate.

Respectfully submitted,

Theodis Chapman and Patrick Nelson
Plaintiffs


Theodis Chapman
Patrick Nelson
2433 W. Washburne
Chicago, Illinois 60612
Phone 708 813 - 3294
tchapasu97@aol.com
mrpatricknelson@gmail.com